[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 99-15054
_____

D. C. Docket No. 10-29531-CA

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 30 2001
THOMAS K. KAHN
CLERK

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

LAMPI  LLC,

Respondent.

_____

Petition for Review of an Application for Enforcement
of the National Labor Relations Board
_____

**(January 30, 2001)**

Before DUBINA, FAY and COX, Circuit Judges.

PER CURIAM:

We have for review a decision and order of the National Labor Relations Board which found that Appellant Lampi, LLC engaged in an unfair labor practice in violation of Sections 8(a)(1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3), and (4). The Board, with one panel member dissenting, found that Lampi violated the Act by terminating an employee, Connie Neely, because of her pro-union activities at Lampi's Huntsville, Alabama plant and her prior testimony before the Board. We have jurisdiction pursuant to 29 U.S.C. § 160(e). Because we conclude that there was no substantial evidence supporting the Board's finding that Lampi violated the Act in firing Neely, we deny enforcement of the Board's order.

## Background

At its Huntsville plant, Lampi manufactures fluorescent light fixtures of various sizes for the consumer market. During all relevant times, Lampi employed approximately 90 to 100 production and maintenance employees. Neely was hired in October 1993 to assemble light fixtures. In the fall of 1994, the International Brotherhood of Electrical Workers, AFL-CIO, Local 558 began a campaign to organize Lampi's workers. Neely was active in the unionization efforts. Lampi management opposed the formation of a union at the plant and made remaining non-

union a company goal.[1]  On the union election day in January 1995, Neely wore 12 or more "Vote Yes" buttons on her blouse.  Neely's supervisor, Virgie McKenzie, saw Neely's buttons and reacted by shaking her head as if she disapproved.  Lampi's employees rejected the union by a vote of 37 to 30.

The Union filed objections to the conduct of the election that were consolidated with other unfair labor practice allegations, one of which involved Neely.  An administrative law judge (ALJ) held a hearing in March 1996.  Neely testified at the hearing that Lampi's Operations Manager Morris Overbeck had interrogated her in advance of the election.  Neely also testified in support of the Union's election observer, Alice Sullivan Young, who had alleged that she was disciplined in

---

[1]     Lampi's policy on unionization was made clear in its personnel handbook, which provides in relevant part:
> This is a non-union plant.
> It is our desire to always remain non-union.  Our goal is to maintain good working conditions, treat people fairly and run our business successfully.  We feel that unions do not create jobs, increase plant effectiveness or produce products that satisfy customers.  We feel that they have the opposite effect.
> Our main objection to Unions is that they reduce team work and harmony.  Unions create a third party instead of allowing people to work together and directly with each other.  Our customers prefer to buy products from a non-union plant as they have less fear of their supply being cut off due to a strike.
> Unions spend money to organize, thus they must recover their expenses by collecting from your pay check.  Unions attempt to gain power by weakening rights and freedom of individual employees.
> It is much better to work together to assure individual growth, security and business success and strengthen individual rights and freedoms.

(R.2-2 at 13.)

3

retaliation for her union activities.[2] Neely has conceded that no supervisor spoke to her about her testimony after the administrative hearing. In May 1996, the ALJ found that Lampi had violated Section 8(a)(1) of the Act, which provides that it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1). The ALJ recommended that a new election be held. There was no union activity at the plant between the failed January 1995 election and Neely's termination.

Before 1996, Neely's job performance record was generally good. She received positive annual reviews from her supervisor McKenzie in October of 1994 and 1995. Neely did, however, receive three warnings about her attendance and one warning because of a safety violation in the period prior to 1996. Lampi closely monitored its assembly employees' efficiency, awarding bonuses to those who performed at or above 100 percent efficiency. Prior to 1996, Neely's efficiency numbers were excellent, often exceeding 100 percent. However, Neely's efficiency began to slide early in 1996. Neely has admitted that McKenzie verbally counseled her in February 1996 to pick up her production numbers. McKenzie also began to informally counsel

---

[2] The ALJ rejected the attack on the disciplinary warning issued to Young made by General Counsel for the Board. Young had voluntarily left Lampi's employ before the March 1996 hearing.

Neely about her falling efficiency, speaking to Neely anywhere from 15 to 20 times about the issue from May to July 1996.

In June 1996, Lampi instituted a new policy that required assembly workers to maintain a 90 percent efficiency level to avoid discipline. In order to temper the harshness of the new rule, Lampi established June as a grace month during which an 80 percent efficiency rating would suffice. Neely's efficiency rating for June was 87 percent. But she began to have more serious problems in July. On July 18, 1996, Neely received two warnings, one for attendance problems and one for affixing incorrect Universal Product Codes (UPCs) on two lamps. Operations Manager Overbeck testified that Lampi considered the mislabeling of the lamps to be a serious infraction.[3] Neely's efficiency numbers were also down sharply in July, to just under 69 percent.

In early August 1996, Overbeck reviewed the July efficiency numbers of the assembly workers. He marked three employees for discharge: Ginger Laudermilk (47.88 percent), Belinda Lowe (83.15 percent), and Neely (68.95 percent). Overbeck then met with McKenzie to discuss Neely's performance. McKenzie informed Overbeck that she could determine no reason for Neely's drop in efficiency and that

---

[3]    In fact, another employee, Belinda Lowe, was suspended for making a similar mistake with a larger number of lamps.

5

Neely did not seem concerned about the problem. They also noted Neely's prior attendance warnings and the warning garnered for the UPC label mistake and concluded that the proper course was to terminate Neely's employment. Overbeck and McKenzie then discussed the issue with Lampi President Heike Holderer, who also agreed that Neely should be terminated because of her poor overall work performance.

On August 5, 1996, Neely was called into McKenzie's office. McKenzie and another supervisor, John Hoffman, were present. McKenzie informed Neely that she was terminated, effective immediately. Neely asked to retrieve her toolbox. Hoffman informed Neely that she would not be able to return to the work area, but he would retrieve her tools. When Hoffman left the room, McKenzie asked Neely whether she had spoken to "Alice" lately. Neely understood McKenzie to be referring to Alice Sullivan Young, the former union election observer, and responded in the negative. McKenzie then told Neely that she was sorry about the firing but reminded Neely that she had been warned that something was going to happen. Neely interpreted this last remark to refer to a February meeting in which McKenzie had informed Neely and others that they would need to increase their production or go work elsewhere.

Within a few days of Neely's firing, she and former co-worker Belinda Lowe were featured on a segment of a local television station's news broadcast. Neely and

6

Lowe said that they were fired because of their involvement with the Union. Neely informed the reporter that Lampi management had told her that she was a "great employee" and then "the next thing you know" terminated her. Lampi President Holderer was also interviewed on the program, saying that Lampi did not "particularly like unions" and was "against them."[4]

The Union filed a charge with the Board on August 16, 1996, alleging that Lampi had improperly terminated Neely in violation of Section 8(a)(1), (3), and (4).[5] The General Counsel filed his complaint in March 1997. Hearings before an ALJ were held in May and July of 1997. In February 1998, the ALJ filed his report, finding that Lampi had violated the Act by firing Neely because of her union activities and prior Board testimony. The ALJ recommended that Neely be offered full reinstatement and paid her lost earnings. On November 30, 1998, the Board, with one member dissenting, adopted the ALJ's recommendations and ordered Lampi to reinstate Neely and make her whole for her lost earnings.

---

[4] The report did note that Lampi's position was that Neely and Lowe were fired after they had been written up numerous times for violating company policy and their terminations had nothing to do with their union support.

[5] Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3). Section 8(a)(4) provides that it is an unfair labor practice to "discharge or otherwise discriminate against an employee because he has filed charges or given testimony" regarding alleged unfair labor practices. 29 U.S.C. § 158(a)(4).

## Issue on Appeal

The single issue on appeal is whether substantial evidence supports the Board's finding that Lampi terminated Neely because of her support of the Union, in violation of Sections 8(a)(1), (3) and (4) of the Act.

## Standard of Review

We treat the Board's factual findings as conclusive if "supported by substantial evidence on the record considered as a whole . . . ." 29 U.S.C. § 160(e). Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *BE & K Construction Co. v. NLRB*, 133 F.3d 1372, 1375 (11th Cir. 1997) (quoting *Florida Steel Corp. v. NLRB*, 587 F.2d 735, 745 (5th Cir. 1979)). While we give proper deference to orders of the Board, "this court will not simply act as its enforcement arm." *Id.*

## Contentions of the Parties

Lampi contends that there was no substantial evidence before the Board that anti-union animus was a motivating factor in Neely's termination. Lampi also argues that the record clearly indicates that it had ample legitimate business reasons to discharge Neely and would have done so absent her union activities and prior Board testimony. The General Counsel contends that the record amply supports the Board's position.

9

Discussion

There are three phases of proof present in a case where an employee has allegedly been discharged because of his or her union activities. First, the General Counsel must demonstrate by a preponderance of the evidence that the employee's protected activity was a motivating factor in the employment decision. *See NLRB v. McClain of Georgia*, 138 F.3d 1418, 1424 (11th Cir. 1998). This showing will establish a Section 8(a)(3) violation unless the employer demonstrates that it would have terminated the employee regardless of the protected activity. *See id*. The General Counsel may then present proof that the proffered reasons for the termination were pretextual, either by showing that the reasons did not exist or were not relied upon in the decision. *See id.*

Our analysis must begin with whether there was substantial evidence before the Board to support a finding that Lampi's decision to terminate Neely was at least partially motivated by her union involvement. The evidence of anti-union animus relied on by the Board was: (1) Lampi had attempted to improperly influence the January 1995 union election; (2) Neely had testified against Lampi in the administrative hearing held in March 1996; (3) the decision finding that Lampi violated Section 8(a)(1) was handed down just 11 weeks before Neely's termination; (4) Lampi management posted a note on its bulletin board informing employees that

10

it planned on appealing the ruling; (5) Lampi President Holderer had told the television reporter investigating Neely's claims that Lampi management "did not particularly like unions" and was "against them"; and (6) McKenzie asked Neely if she had seen "Alice" lately on the day Neely was fired.

We conclude that the evidence before the Board was not sufficient to support its finding that Neely's firing was motivated by her protected activity. As an initial matter, the Board violated the express language of the Act in relying on Holderer's statement to the television reporter and Lampi's announcement that it planned to appeal the prior ruling to support a finding of animus. Section 8(c) of the Act expressly prohibits the use of an employer's lawful communication of its opinion of unions or unionization as "evidence of an unfair labor practice" as long as the expression of opinion is not coercive, does not contain threats of reprisal or force, or does not promise benefits. 29 U.S.C. § 158(c). Neither Holderer's statement nor the posted announcement was coercive or made threats or promises. The Board was therefore not free to infer anti-union animus from Holderer's statement that Lampi was "against" unions or the announcement that Lampi would appeal the ALJ's ruling

on the allegations stemming from the election. *See BE&K Construction Co.*, 133 F.3d at 1376.[6]

Cobbling together a finding that Neely's termination was motivated by her union activities required the Board to impermissibly lay inference upon inference. First, the Board inferred, without any evidence in the record, that Lampi management carried a grudge against Neely stemming from the events leading up to the January 1995 election. This, of course, ignores the fact that Neely received positive employment reviews in the year following the election. The lingering animus against Neely was further inflamed, in the Board's view, by Neely's testimony at the administrative hearing held to resolve issues surrounding the election. Again, there was no evidence that Lampi management retaliated or even mentioned her testimony after the hearing.

The final link in this flimsy causal chain is McKenzie's question about whether Neely had seen "Alice" lately. The ALJ undertook an extensive analysis of the meaning of McKenzie's question, identifying three potential interpretations. The first potential interpretation formulated by the ALJ was that the question meant that "'[t]op management nailed you for supporting the Union, and especially for testifying against

---

[6]     The same would hold for the policy on unionization included in Lampi's employee handbook, which the Board apparently did not rely upon in concluding that anti-union animus triggered the firing.

them'" in the administrative hearing. (R.3 at 699.) The second potential interpretation recognized by the ALJ was that McKenzie was informing Neely that "'[y]es, you supported the Union and testified against us, and I get a kick out of this opportunity to rub your nose in the fact that a big union supporter like you is being fired, but regardless of all that, you would have been fired today anyhow because of your poor efficiency in July.'" (*Id.*) The third and final potential interpretation posited by the ALJ was that the question meant "'I saw Alice at the mall last week and she asked about you. Have you talked with her lately?'" (*Id.*) The ALJ and later, the Board, concluded the most logical interpretation of McKenzie's question had to be the first. The ostensibly simple question of whether Neely had seen "Alice" lately was therefore, in the ALJ and Board's view, a furtive attempt to let Neely know that "top management," not McKenzie, was responsible for deciding to discharge Neely and that decision was driven by Neely's support for the Union and prior Board testimony.[7] We conclude, as did the dissenting Board member, that this interpretation of McKenzie's question was both unfounded and speculative.

Even when viewed in a generous light, the evidence relied on by the Board simply does not meet the substantial evidence standard. The combination of Lampi's

---

[7] We note in passing that there was no evidence presented that Neely interpreted McKenzie's question in a manner similar to the ALJ.

prior anti-union behavior, the timing of Neely's termination and McKenzie's question about "Alice" could not be deemed substantial evidence that Neely was fired because of her union activity and prior Board testimony. Because the evidence before the Board was insufficient to link Neely's protected activity with her termination, we decline to enforce the Board's order.

Even if we assume arguendo that the General Counsel presented a prima facie case that Neely was fired in violation of the Act, there was insufficient evidence presented to support the Board's finding that Lampi's proffered reasons for terminating Neely were pretextual. To the contrary, the record supports Lampi's contention that it terminated Neely for cause. The record clearly shows that Neely's performance declined precipitously in the period prior to her termination. McKenzie verbally counseled Neely 15 to 20 times about her poor performance in the period of May through July. McKenzie testified that Neely simply did not seem to care about her falling efficiency numbers. Neely was also disciplined twice in June 1996 for excessive absenteeism and a failure to place the correct UPC on several lamps. Neely's efficiency numbers for June were 87 percent, below the 90 percent standard

set by Lampi.[8]  Her July numbers were significantly worse, falling below 69 percent. Lampi terminated Neely in August because of her overall poor work performance.

The Board found that Lampi's proffered reasons for Neely's termination were pretextual because: (1) Lampi's employee handbook did not provide that a failure to meet the 90 percent efficiency standard would automatically result in termination; (2) other employees who failed to meet the 90 percent standard in July were not terminated; and (3) the disciplinary warning issued to Neely for her UPC error did not inform Neely that she would be terminated for another "severe offense."  As with the evidence supporting the Board's finding of anti-union animus, we conclude that the evidence before the Board was insufficient to support its finding of pretext.  The record is clear that Lampi was greatly concerned about efficiency numbers and disciplined those employees who failed to meet the 90 percent standard.  In fact, Lampi fired two other employees, Lowe and  Laudermilk, in August 1996 for, inter alia, failing to meet production levels.  That the employee handbook did not provide that termination was *automatic* for failing to meet the standard does not alter the fact that Lampi was  justified in terminating an employee whose efficiency numbers were

---

[8]Neely's performance in the months previous had been similarly borderline.  After starting 1996 with a strong 124 percent efficiency number in January, Neely's efficiency rating was 88 percent in February, 95 percent in March, 89 percent in April, and 91 percent in May.

unsatisfactory.[9]    The Board suggests that Neely was unfairly singled out because three other employees who failed to meet the 90 percent standard in July were given written warnings instead of being fired. However, there is nothing in the record to suggest that these three employees had either been verbally counseled 15 to 20 times about poor efficiency in the preceding months or had shown an utter lack of concern about their falling production numbers, as Neely had. Therefore, these three employees are not appropriate comparators for Neely.

The record also does not support the Board's conclusion that because Lampi failed to warn Neely that she could be terminated for the next "severe" offense following her UPC mistake, it did not consider Neely's poor performance to be worthy of termination. Neely acknowledged during the administrative hearing that McKenzie had informed her that a failure to keep up her efficiency numbers could lead to termination. Moreover, McKenzie verbally counseled Neely many times that she needed to increase her production numbers and found that Neely seemed not to care about her falling efficiency. The record therefore supports Lampi's contention that it was concerned about Neely's performance. Moreover, the record is clear that

---

[9]    Lampi fired Neely pursuant to Policy 2.2.9 of the employee handbook, which provides, in part that: "[a]n employee can be disciplined for carelessness, unsatisfactory work, or neglect of duty." (R.2-2 at 4.) It further provides that punishments may include anything from verbal counseling to termination. The handbook does not, however, require that a set number of warnings or other punishments be imposed before terminating an employee under Policy 2.2.9.

16

Neely was made aware of the potential consequences of her poor performance several months in advance of her termination. Accordingly, we conclude that there was insufficient evidence in the record to support the Board's finding that Lampi would not have terminated Neely absent her union activities or prior Board testimony.

## Conclusion

Because the Board's factual findings were not supported by substantial evidence in the record as a whole, we deny enforcement of the Board's order.

ENFORCEMENT DENIED.